248 N.J. Super. 540 (1991)
591 A.2d 966
JOHN CRISPIN, PLAINTIFF-RESPONDENT/CROSS-APPELLANT,
v.
VOLKSWAGENWERK AG, A WEST GERMAN CORPORATION, AND VOLKSWAGEN OF AMERICA, INC., A NEW JERSEY CORPORATION, DEFENDANTS-APPELLANTS/CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 16, 1991.
Decided May 30, 1991.
*543 Before Judges PRESSLER, DEIGHAN and BAIME.
John T. Dolan argued the cause for appellants/cross-respondents (Crummy, Del Deo, Dolan, Griffinger & Vecchione, attorneys; John T. Dolan on the brief).
Carol L. Forte argued the cause for respondent/cross-appellant (Blume, Vazquez, Goldfaden, Berkowitz & Donnelly, attorneys; Carol L. Forte on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
*544 This appeal and cross-appeal arise out of a Law Division judgment, awarding plaintiff damages and prejudgment interest totalling $4,800,000. Plaintiff suffered devastating injuries as a result of an automobile accident in which his 1971 Volkswagen Beetle traversed a highway median, revolved in a semicircle, and was struck from the rear by an oncoming Chevrolet Nova. Plaintiff, who was not wearing seat belts, suffered a fracture of the spine causing permanent quadriplegia. In prior litigation, plaintiff received a settlement of $200,000 plus an annuity valued at $650,000 from the Department of Transportation (DOT) and the contractor who was repairing the highway median when the accident occurred. The damages for which the judgment was entered in this case pertained solely to second-collision injuries, i.e., those injuries enhanced by the presence of the alleged defect  not those caused by the crash alone. Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 476 A.2d 250 (1984). In its verdict, the jury predicated liability on its finding that the Volkswagen front seat was defectively designed because it collapsed upon impact. Alternatively, the jury found that defendant failed to provide users with adequate warning of the dangers attributable to non-use of the seat belts.
In its appeal, defendant contends that the Law Division judge committed reversible error by unduly restricting its cross-examination of plaintiff's expert witnesses. It further asserts that the judge improperly limited evidence of industry custom in support of its state of the art defense. Defendant also claims that plaintiff failed to present a prima facie case of design defect and failure to warn. Defendant finally contends that the judge erred by failing to mold the verdict to reflect the jury's finding of plaintiff's comparative negligence and by refusing to allow it a credit for the amount of the settlement in the previous litigation. In the cross-appeal, plaintiff asserts that the trial court improperly suspended prejudgment interest, excluded relevant evidence pertaining to past and future medical *545 expenses, and incorrectly dismissed his claim for punitive damages. We find no error warranting a reversal or modification of the Law Division judgment.

I.
The tortuous path this case has taken was recounted at length in Crispin v. Volkswagenwerk, A.G., 96 N.J. at 342, 476 A.2d 250. Plaintiff was paralyzed as a result of a multi-car accident on the Garden State Parkway on December 10, 1977. Plaintiff's automobile entered a southbound lane of the highway from a construction site and was struck in the rear by a Chevrolet Nova driven by Victoria Rapicka. The accident spawned numerous lawsuits. The first proceedings, conducted in Union County, involved plaintiff, Rapicka and a passenger in her vehicle, Mary Lothrop, the DOT and S.J. Groves & Sons Company (Groves), the construction contractor on the site. Defendant was not originally named as a defendant in any of the suits filed in Union County.
However, on November 8, 1979, a television news program reported that the Volkswagen Beetle had a design defect referred to as an "ejector seat." There was allegedly a tendency for the front seat to collapse, causing the occupant to be hurled in the direction of the heavily weighted engine structure in the rear. After becoming aware of this allegation, plaintiff's attorney (not present counsel) filed a complaint against defendant in Bergen County on December 7, 1979, but did not inform the court in Union County or the other parties of that action. Instead, the Bergen County suit remained dormant during the pendency of the Law Division actions in Union County. When the DOT learned of the television report, it moved for leave to file a third-party complaint against defendant. Even then, plaintiff's attorney remained silent about the Bergen County complaint. The DOT's motion to implead defendant was denied. We thereafter denied the DOT's motion for leave to appeal, and the Union County litigation continued. As noted *546 previously, plaintiff's claims against Groves and the DOT were settled. So too, Rapicka's suit against plaintiff was dismissed based upon a settlement. The remaining case in Union County, pitting Lothrop against the plaintiff, was ultimately tried, resulting in jury findings that plaintiff was 67% at fault, Groves 13% and the DOT 20%.
After all the Union County litigation was completed, plaintiff's attorney served Volkswagen in the Bergen County action. Defendant's motion to dismiss the complaint was granted without prejudice for failure to serve the summons within ten days. See R. 4:4-1. Both parties appealed that order to the Appellate Division. While that appeal was pending, plaintiff reinstituted suit against defendant, this time laying venue in Essex County. Defendant unsuccessfully moved to dismiss plaintiff's complaint on the basis of the entire controversy doctrine. At this point, we rendered an unreported opinion, affirming the dismissal without prejudice of plaintiff's Bergen County complaint. The Supreme Court granted certification in the Bergen County suit and granted leave to appeal in the Essex County matter.
On June 13, 1984, the Supreme Court rendered its decision. We need not describe the Court's opinion in detail. Suffice it to say, the Court deplored the tactics of plaintiff's original attorney but found that defendant suffered no prejudice. Noting that plaintiff's suit against Volkswagen was limited to the enhanced second collision injuries allegedly sustained by reason of the defective seat, the Court emphasized that "safeguards" should be created to insulate or segregate these damages from those caused by the original "crash alone." 96 N.J. at 346, 476 A.2d 250. The Court cautioned that the trial judge was dutybound to "carefully mould its procedures so that Volkswagen's liability is appropriately limited," stressing that "[p]roper credit must be afforded for the recovery previously allowed." Ibid.
The voluminous record of the trial reveals the following facts. At approximately midnight on December 10, 1977, plaintiff was operating his 1971 Volkswagen Beetle in a northerly *547 direction on the Garden State Parkway. At the time, the highway was under construction with its median being reduced in size to accommodate an additional lane in both north and southbound directions. For reasons which are unclear, plaintiff's automobile suddenly traversed the median, spun around so that it was pointed in the southbound direction, and was struck in the rear by Rapicka's Chevrolet Nova. Rapicka's vehicle was deflected and was then struck by another automobile driven by Joseph Morrison.
Plaintiff was rendered unconscious and suffered retrograde amnesia. Morrison and first aid personnel found plaintiff with his body extended across the rear seat and with his head outside the broken rear window. The driver's seat was bent backward in a downward direction, ultimately resting on the rear seat. Plaintiff sustained multiple severe injuries. As noted previously, the only injury for which plaintiff sought recovery against Volkswagen was quadriplegia resulting from compression of the spine and severance of the spinal cord when his body continued rearward into his neck as his head violently struck the rear structure of the automobile.
Although the Volkswagen was equipped with a three-point safety belt system which included independent lap and shoulder harnesses mounted to the floor and side of the vehicle, plaintiff was not wearing the seat belts. It is undisputed that the force of the collision caused the vertical part of plaintiff's seat to decline until it rested on the back seat, and that his body was hurled at high speed to the rear until his head struck the body of the car, causing quadriplegia.
Both parties agreed that Rapicka's automobile was decelerating from a speed of approximately 45 miles per hour immediately prior to impact. At trial, the question of the speed of plaintiff's automobile upon impact with that of Rapicka's was hotly contested. Plaintiff contended that the combined speed at impact was between 30 and 35 miles per hour and that such a relatively low speed collision would not have rendered him a *548 quadriplegic had defendant designed the 1971 Volkswagen seat in accordance with readily available and inexpensive technology. Defendant asserted that the combined speed at impact was 60 miles per hour or greater and that no automobile seat could withstand a collision at that "closing" velocity. Defendant further claimed that all motor vehicle manufacturers intentionally incorporated "yielding" into their seats as a method of absorbing accident impact energy. It was defendant's position that it had designed its front seat to yield at a velocity change of 35 miles per hour and that occupants were to be protected against "ejection" by the "hindering effect" of the seat belts.
Later, in our opinion, we will describe in greater detail the evidence offered by the parties in support of their respective positions. It suffices to observe here that both parties presented expert witnesses who estimated the closing speed of plaintiff's and Rapicka's automobiles by utilizing various "crash" studies and comparing the damage to the automobiles in these experiments with that shown in photographs of Crispin's vehicle.
Plaintiff's expert, Lynn Bradford, was employed by the National Highway Traffic & Safety Administration (NHTSA), Office of Defects Investigations (ODI) between 1968 and 1983. He was the director of the ODI from 1977 until he left government service in June 1983. In 1979, Bradford supervised the testing of Volkswagen Beetles, conducted under contract for ODI by a private firm, Dynamic Sciences. In these tests, four stationary Volkswagens were struck at 30 miles per hour by Chevrolet Impalas. Two of the tests involved 1972 Volkswagens which had the same seating arrangement as the 1971 model. In one of the two, the Volkswagen was stationary and its brake was applied at normal foot pressure, while the Chevrolet Impala was raised in the rear and tied down in the front to simulate emergency braking. Films displayed to the jury and accompanied by Bradford's narration, disclosed that as the Impala struck the Volkswagen at 30 miles per hour, the Volkswagen vertical seat backs declined toward the rear, hurling the *549 dummies, who were not restrained by seat belts, into the rear structure of the car. The other test depicted identical results where the Volkswagen brakes were not applied. In evaluating the severity with which plaintiff's Volkswagen was hit by Rapicka's automobile, Bradford compared photographs of those vehicles with the videotapes and still photographs taken from the ODI study. Bradford concluded that the 1971 Volkswagen was defective because its seat collapsed rearward in the course of a relatively mild 30 to 35 mile per hour collision. He testified that available technology could have been used to strengthen the seat at affordable costs.
In contrast, defendant's expert, utilizing a photometric analysis and static tests as well as other data, calculated that the combined speed of the two automobiles at impact was at least 60 miles an hour. Defendant also presented evidence which disclosed that seat belts were a necessary component of its design of the Volkswagen seating arrangement. Dr. William MacKay, a biomechanical engineer, testified that the seat belt system constituted an "integral part of the seating design." According to the witness, plaintiff would have sustained only minor injuries had he utilized the shoulder and waist seat belts. Although seat belts were part of the safety design utilized by Volkswagen to protect front seat occupants, no warning was ever given to potential users of the necessity of wearing seat belts. It is undisputed that plaintiff did not wear seat belts because he believed that they had the potential to enhance injuries in high speed collisions.
As we noted previously, the jury found defendant responsible for plaintiff's quadriplegia based upon a design defect and a failure to warn users of the dangers attributable to the Volkswagen's front seating arrangement. The jury determined that plaintiff's failure to wear the seat belts contributed to his injuries and that he was 25% at fault. Because one of the bases of defendant's liability was its failure to warn, the trial court refused to mould the verdict to reflect plaintiff's comparative negligence. The court entered judgment in the amount of *550 $4,810,714.79, reflecting the jury's award of $3,113,814 in compensatory damages and interest in the sum of $1,696,900.79.

II.
We first consider defendant's argument that the trial court unduly restricted defendant's cross-examination of Bradford and erred by refusing to admit portions of the ODI report into evidence. Two related arguments are advanced. Defendant first asserts that it should have been permitted to confront Bradford with that portion of the ODI report setting forth its "conclusions" and "final observations." Defendant next contends that this part of the report should have been admitted under Evid.R. 63(15).
As we noted earlier, Bradford was the director of the ODI between 1977 and June 1983. In 1971, the ODI had conducted a study designed to determine whether there was a problem with seat performance in rear impacts on Volkswagen Beetle models from 1947 to 1970. In February of 1974, the ODI issued a report on the subject in which it observed that the "seat or seat track" did not present a safety hazard. The report left unanswered whether the "total system involving but not limited to the seat, its proximity to surrounding structures, the vehicle structural stiffness and the human body injury exposure" was unsafe.
In 1979, the ODI reopened its investigation based upon the allegations made in the television news report which we alluded to earlier. The purpose of the government sponsored tests was to duplicate the "ejection" phenomenon. Bradford supervised that testing. As we mentioned, Bradford's testimony at trial was based in part upon the tests performed under his supervision. The ODI report was issued in 1984, after Bradford left government service. Although Bradford had never seen the final report and played no part in preparing the section denominated "conclusions" and "final observations," defense counsel sought to cross-examine the witness utilizing a "blow-up" of *551 the last two pages. This portion of the report contained spaces for five conclusions. However, in its final version, the report set forth four "conclusions" and "final observations." These included statements to the effect that (1) where closing speeds of the automobiles tested "were over 30 mph," the seats failed, "allowing the front seat dummies to be thrown into the rear seating area," (2) in 1980 ODI tests of Volkswagen Beetles "impacted from the rear at 30 mph by full size vehicles, the seat backs failed in a controlled manner," (3) the Volkswagen seat and track assembly "was capable of absorbing energy levels as great or greater than seats in American compact vehicles and other imported vehicles," and (4) "in rear impact crash tests with closing speeds in excess of 30 mph, almost without exception, seats in all passenger vehicles fail[ed], allowing the occupants to enter the rear seating area." (Emphasis in original).
The trial court barred counsel from confronting Bradford with the "conclusions" and "final observations" expressed in the last two pages of the report. In sustaining plaintiff's objection, the court noted that (1) Bradford in no way participated in the preparation of this portion of the report, (2) in his testimony given at an Evid.R. 8 hearing, the witness stated that he did not consider the conclusions a recognized standard authority on the subject and in fact disagreed with them, and (3) the conclusions represented opinions which were not sufficiently reliable to permit admission under Evid.R. 63(15). The court also precluded defendant from admitting the conclusions contained in the report in its own case.
We find no prejudicial error in the trial court's restriction of defense counsel's cross-examination of Bradford. In reaching this conclusion, we stress Bradford's undisputed testimony that he did not participate in the preparation of the "conclusions" and "final observations" of the ODI report. We emphasize that the report was released to the public after Bradford had departed from the ODI. In fact, Bradford was *552 not aware of the fact that the report had been issued and disagreed strenuously with the conclusions contained in the document. We note that New Jersey has not adopted a counterpart to Fed.R.Evid. 803(18), which permits a party to read into evidence excerpts from treatises, periodicals or pamphlets called to the attention of any expert on cross-examination. Evid.R. 63(31), which mirrors the federal evidentiary rule, was proposed but not adopted. In New Jersey, a treatise, periodical or report may be used to attack an expert's credibility only if the witness admits that the document constitutes a recognized standard authority on the subject involved. See McComish v. DeSoi, 42 N.J. 274, 281, 200 A.2d 116 (1964); Ruth v. Fenchel, 21 N.J. 171, 176, 121 A.2d 373 (1956). Perhaps this limitation is unduly restrictive. The rule is of ancient lineage, however, and we have no occasion here to consider whether a more liberal policy of admission should prevail. See New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co., 59 N.J.L. 189, 192, 35 A. 915 (E. & A. 1896). In any event, we cannot fairly say that the trial court abused its discretionary powers. See State v. Pontery, 19 N.J. 457, 473, 117 A.2d 473 (1955).
We also find no mistaken exercise of the trial court's discretion in refusing to admit the "conclusions" and "final observations" as a finding of a public official under Evid.R. 63(15). That rule permits the admission of a hearsay statement if it concerns "an act done, or an act, condition or event observed by a public official if it was within the scope of his duty either to perform the act reported or to observe the act, condition or event reported and to make a written statement." Ibid. Until recently, the rule had been construed as allowing only the introduction of factual statements, not opinions or conclusions. See Millison v. E.I. du Pont de Nemours, 226 N.J. Super. 572, 593, 545 A.2d 213 (App.Div. 1988), aff'd 115 N.J. 252, 558 A.2d 461 (1989); Biro v. Prudential Ins. Co. of America, 57 N.J. 204, 205, 271 A.2d 1 (1970); Gunter v. Fischer Scientific American, 193 N.J. Super. 688, 694, 475 A.2d 671 (App.Div. 1984); Phillips v. Erie Lackawanna R.R. *553 Co., 107 N.J. Super. 590, 595, 259 A.2d 719 (App.Div. 1969), certif. den. 55 N.J. 444, 262 A.2d 700 (1970); Biunno, New Jersey Rules of Evidence, Comment 1 to Evid.R. 63(15) at 659 (1991). More recently, greater attention has focused upon the general reliability or trustworthiness of the public official's declaration. See, e.g., State v. Matulewicz, 101 N.J. 27, 31, 499 A.2d 1363 (1985); cf. Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169, 109 S.Ct. 439, 449, 102 L.Ed.2d 445, 463 (1988). Here, the trial court found no reason to believe that the "conclusions" and "final observations" were reliable, particularly because they were contrary to the opinions of the former public official who supervised the tests and the fact that part of the text had been deleted without explanation. From the vantage point of twenty-twenty hindsight, we cannot say that the trial court was wrong.
In any event, we note that the court allowed defendant free rein in examining Bradford on the underlying data. So too, the defense presented substantial evidence concerning the crash experiment. Utilizing this data, a defense expert compared the damage to the crash test vehicles with that which resulted from the accident, concluding that the combined impact speed was well in excess of 60 miles per hour. The simple and overriding fact is that defendant opted not to present the individual responsible for the ODI report conclusions. Even assuming that error was committed, we are thoroughly convinced that defendant was not prejudiced.

III.
We reject defendant's argument that the trial court improperly excluded evidence of industry custom. Although ambiguously phrased, defendant contends that Volkswagen's seat arrangement was stronger than that utilized in other automobiles. More specifically, defendant asserts that the trial court unduly restricted its attempt to confront Bradford with information *554 concerning industry custom which, it claims, comported with the state of the art.
Our review of the voluminous record convinces us that defendant was not prejudiced by the limitations placed upon the admission of this evidence. The state of the art refers to the existing level of technological expertise and scientific knowledge relevant to a particular industry at the time a product is designed. O'Brien v. Muskin Corp., 94 N.J. 169, 182-184, 463 A.2d 298 (1983). State of the art is a relevant factor in considering the adequacy of the design of a product under the risk utility analysis, including particular design features relating to safety. Johnson v. Salem Corp., 97 N.J. 78, 88, 477 A.2d 1246 (1984). Although state of the art evidence may be dispositive on the facts of a particular case, it does not constitute an absolute defense apart from its appearance as one of the components of balancing risk with utility factors. O'Brien v. Muskin Corp., 94 N.J. at 183, 463 A.2d 298; see also Beshada v. Johns-Manville Products Corp., 90 N.J. 191, 201-205, 447 A.2d 539 (1982). Compliance with state of the art need not, as a matter of law, compel a judgment for a defendant. O'Brien v. Muskin Corp., 94 N.J. at 183-184, 463 A.2d 298. Customs of an industry may be relevant in establishing state of the art. Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 171-172, 406 A.2d 140 (1979). However, reliance on custom alone is inadequate because "a whole [industry] may have unduly lagged in the adoption of new and available devices." The T.J. Hooper, 60 F.2d 737, 740 (2d Cir.1932), cert. den. sub nom. 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932). A manufacturer "may have a duty to make products pursuant to a safer design even if the custom of the industry is not to use that alternative." O'Brien v. Muskin Corp., 94 N.J. at 183, 463 A.2d 298.
It is against this backdrop that we consider defendant's argument. Viewed in isolation, several of the trial court's evidentiary decisions seem questionable. However, the trial *555 court's overriding concern was that defendant did not sufficiently link the evidence sought to be admitted to the broader concept of state of the art and its place, in turn, within the risk-utility framework. In seeking to establish industry custom, defendant attempted to refer to automobiles which significantly differed from the Volkswagen. The 1971 Beetle was a rear-engine car weighing approximately 1,800 pounds. It was a sub-compact in size. The automobiles alluded to by defendant to establish industry custom were front-engine full-sized luxury models weighing up to 5,000 pounds. Even defendant's expert conceded that the increased risks posed by smaller automobiles, such as the Beetle, required greater safety precautions. In that context, the trial court's concerns relating to customs of an industry where seat performance could be affected by such wide variables was essentially sound. In our view, it was proper for the court to limit defendant by requiring that any comparison to other manufacturer's seats be predicated upon similar automobiles. We discern no prejudicial errors in that respect. Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 290, 579 A.2d 1241 (1990).
Moreover, the trial court's evidentiary rulings should not be viewed in isolation. Defendant presented substantial evidence that the strength of the Volkswagen seat was 40% greater than that of many other vehicles. The overarching fact is that defendant was permitted to introduce a great quantity of evidence indicating that its product, at the very least, comported with industry custom and was consistent with the highest technology then available. We perceive no error capable of producing an unjust result.

IV.
We next address defendant's argument that the trial court erred by restricting its use of videotapes of crash testing performed during the New Car Assessment Program (NCAP) *556 by the NHTSA on non-Volkswagen and similar crash testing preformed by defendant on its own automobiles.
We first consider the crash tests on non-Volkswagens. Defendant offered films of these tests as demonstrative evidence to show that all seats "yield" upon rear-end impact. The films depicted rear-end crashes at 35 miles per hour and their effect upon dummies who were restrained by seat belts. Because the automobiles depicted in the videotapes were newer and heavier than the 1971 Volkswagen Beetle, the trial court found that the probative value of the evidence was outweighed by its potential for undue prejudice. Considering the wide variation between the test vehicles and the seat belt systems used in the videotapes and the 1971 Volkswagen Beetle, we find no abuse of the trial court's discretion under Evid.R. 4. See Balian v. General Motors, 121 N.J. Super. 118, 128, 296 A.2d 317 (App.Div. 1972), certif. den. 62 N.J. 195, 299 A.2d 729 (1973).
The other videotapes sought to be admitted by defendant showed crash tests in which defendant ran a 1967 Chevrolet Impala station wagon into a 1971 Volkswagen Beetle at 33 miles per hour. Defendant's purpose in offering these films was to contradict Bradford's explanation why photographs and videotapes of the ODI tests disclosed less severe damage than that depicted in photographs of plaintiff's automobile. Bradford had testified that the damage to the Crispin automobile was "higher up" on the car's rear panel than that shown in the ODI study because the "crashing vehicle" in the ODI test was tied down to simulate braking. Defendant wished to compare the damage in the ODI test with the damage to the vehicles in the Volkswagen crash videotapes. The trial court excluded defendant's offer of photographs of the Volkswagen test on the basis that the two studies were performed under entirely different circumstances. The ODI test showed a straight front to rear-end crash, while the Volkswagen experiment was performed at a 15-degree angle. Other differences existed. According to the court, there were "far too many other variables" *557 to correlate the two tests. We are satisfied that the issue fell within the domain of the trial court's discretion. We discern no prejudicial error in excluding this evidence.
Before leaving the subject, we stress the limited purpose for offering the Volkswagen test photographs, as expressed by defendant's attorney at trial. Defense counsel sought to compare the ODI test with the Volkswagen test in an attempt to contradict Bradford's testimony. Our interpretation of the record is that defendant was not seeking to offer the Volkswagen test photographs to compare the damage with that shown in the photograph of Crispin's automobile. We note that defendant's expert testified as to his perception that plaintiff's automobile suffered greater damage than the ODI crash test Volkswagens because the Crispin vehicle was struck at a closing speed of 60 miles per hour. Defendant's expert also offered his opinion that the damage inflicted on the Volkswagen crash test vehicles was far less than that suffered by Crispin's automobile as a result of its collision with Rapicka's car.
In sum, we are satisfied that the trial court did not abuse its discretion and, in any event, defendant was not prejudiced.

V.
Defendant argues that plaintiff failed to establish a prima facie case on his claim of design defect. It is asserted that plaintiff did not prove the existence of a defect and also failed to establish a reasonable alternative to the seating design used in the Volkswagen Beetle. We reject both contentions.
As posed by defendant, the controlling issue is whether the jury could reasonably find that Volkswagen's seat design was defective. The applicable test is whether, at the time the manufacturer distributed the product, it was reasonably fit, suitable and safe for its intended or reasonably foreseeable purpose. See Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 169, 406 A.2d 140. It was incumbent upon plaintiff *558 in proving strict liability to demonstrate that the product was defective when placed by defendant in the "commercial stream." Id. at 170, 406 A.2d 140; see also Moraca v. Ford Motor Co., 66 N.J. 454, 460, 332 A.2d 599 (1975). The determination whether a product is reasonably fit, suitable and safe for its intended use is measured by a risk-utility analysis. Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. 152, 172-179, 386 A.2d 816 (1978). Under this approach, a product is defective if a reasonable person would conclude that "the magnitude of the scientifically perceivable danger as it is proved to be at the time of trial outweighed the benefits of the way the product was so designed and marketed." Id. at 172-173, 386 A.2d 816, quoting Keeton, Product Liability and the Meaning of Defect, 5 St. Mary's L.J., 30, 37-38 (1973). (Emphasis in original).
Our research discloses no reported New Jersey opinion dealing with crashworthiness and second collision injuries in the context of products liability. In a series of decisions, the federal courts have held that there must be proof of (a) a defective design actually utilized, (b) the existence of a safer, practicable alternative and (c) injuries which could have been prevented had the safer design been employed. See Seese v. Volkswagenwerk, A.G., 648 F.2d 833, 843 (3d Cir.1981), cert. den. 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981); Dawson v. Chrysler Corp., 630 F.2d 950, 960 (3d Cir.1980), cert. den. 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); Huddell v. Levin, 537 F.2d 726, 737-738 (3d Cir.1976). Within this analytical framework, defendant contends that (1) Bradford's testimony was incompetent to establish the speed of the colliding vehicles and thus was insufficient to prove there was a design defect, and (2) plaintiff failed to prove that a reasonable and feasible alternative design existed. We are unpersuaded by these arguments.
Initially, we are satisfied that Bradford's opinion on "crash severity" was properly admitted. As we mentioned earlier, *559 Bradford relied upon a comparison of the damage inflicted upon the Crispin vehicle with that depicted in the ODI test crash photographs, as well as other evidence. Although defendant challenges this method of estimating impact speed, its own witnesses conceded that they too had used photographic depictions of damage in estimating the relative speed of the automobile at the time of the collision. We discern nothing wrong in this approach.
To be helpful to the trier of fact, expert testimony must be sufficiently reliable. State v. Kelly, 97 N.J. 178, 209, 478 A.2d 364 (1984). Evid.R. 56(2) imposes three requirements for the admission of expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror, (2) the areas testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable, and (3) the witness must have sufficient expertise to offer the intended testimony. State v. Kelly, 97 N.J. at 208, 478 A.2d 364. In Ryan v. KDI Sylvan Pools, Inc., our Supreme Court considered the test applicable in assessing whether the data relied upon by an expert was reasonably reliable. 121 N.J. at 287, 579 A.2d 1241. Citing Fed.R.Evid. 703 and our Evid.R. 56(2), the Court said that the object is to "bring the judicial practice into line with the practice of the experts themselves when not in court." Ibid., quoting Soden v. Freightliner Corp., 714 F.2d 498, 512 (5th Cir.1983). As phrased by the Court, "[t]he indicia of reliability ... is the fact that experts in the field in question rely on this type of data." Ibid., quoting In re Japanese Electronic Products, 723 F.2d 238, 277 (3d Cir.1983). The Court interpreted Evid.R. 56(2) as requiring inquiry into "whether experts in the given field rely on certain information," and, if so, whether such reliance is "presumed to be reasonable." Id. at 289. "The focus should be on what the experts in fact rely on, not on whether the court thinks they should so rely." Ibid.
Applying this test here, we find that plaintiff satisfied the foundational basis for admission of Bradford's opinion *560 testimony. Experts have long relied upon reports of physical evidence from the crash scene, such as the length of skid marks before impact. See DiNizio v. Burzynski, 81 N.J. Super. 267, 272, 195 A.2d 470 (App.Div. 1963). The record here contains ample evidence that experts often rely upon comparison of crash damage in determining impact speed. There is nothing in the trial transcript to suggest that reliance on photographic depictions of crash damage is unreasonable or unreliable. It cannot fairly be said that the court's decision, permitting admission of Bradford's testimony, was "clearly erroneous." Crespo v. McCartin, 244 N.J. Super. 413, 422, 582 A.2d 1011 (App.Div. 1990). Through Bradford's testimony, plaintiff presented sufficient evidence of a product defect to require submission of the question to the jury.
Equally unpersuasive is defendant's contention that plaintiff failed to present evidence of the possibility of an "alternative, safer design." Huddell v. Levin, 537 F.2d at 737. Bradford identified three seating designs which had been tested prior to 1971, but had not been incorporated into a production automobile. The witness testified that research revealed a capability to strengthen the seat at a cost of $10 so that it would not decline in a collision. As an engineer with substantial credentials, Bradford was clearly qualified to testify as an expert on alternative, practical safer designs, particularly since he had an extensive background in the development of safety performance of automobile seats. Bradford's testimony that Volkswagen could have increased structural strength through use of steel alloys at a minimal cost, adequately established that a safer, alternative design was feasible. See Macri v. Ames McDonough Co., 211 N.J. Super. 636, 640, 512 A.2d 548 (App.Div. 1986).

VI.
We also find that plaintiff's failure to warn theory was properly submitted to the jury. Contrary to defendant's argument, *561 plaintiff's complaint and his pretrial memorandum were sufficient to put Volkswagen on notice of this alternative basis of liability. The complaint alleged that defendant failed to warn plaintiff "of defects and dangers which [it] knew or should have known existed in the subject vehicle." Plaintiff's pretrial memorandum set forth two theories of recovery: "the seat was defective in that it could have been made to withstand the impact," and "VW [did not] warn drivers of the dangers presented by the seat system."
We recognize that the evidence presented in plaintiff's direct case was probably insufficient to establish his claim of a defect by reason of defendant's failure to warn. Plaintiff testified that he never used seat belts because he felt that they could increase the danger of injury. Bradford testified that less than 17% of drivers used seat belts in 1977 and that use of the lap and shoulder harnesses in the 1971 Volkswagen would not have made plaintiff safer. Another expert presented by plaintiff, Harold Alexander, testified that the use of seat belts would have made no difference because plaintiff would have slid under the harnesses when the vertical part of the seat declined and would have been propelled into the rear structure.
At the conclusion of plaintiff's case, defendant moved for a directed verdict on the theory that Crispin had not presented a prima facie case of a design defect. Significantly, no mention was made of plaintiff's failure to warn theory.
In defendant's case, evidence was presented that when the Volkswagen seat declined in a rear-end crash, the seat belt was designed to restrict movement of the occupant "so that there is not the opportunity for the occupant to be thrown into a hard and unyielding surface." According to defendant's expert, the seat belt system was designed "to decelerate the body of the occupant so that it does not strike the back end in the same velocity or the same plane." Another expert presented by defendant testified that Volkswagen knew its seat would "deform" in some rear-end crashes. The witness admitted that the *562 seat was designed to protect drivers in low velocity crashes. Because the vertical part of the front seat was designed to yield in high speed impacts, Volkswagen envisioned that the seat belt would serve to protect the occupants in such collisions. The witness testified as follows:
The seat design, our seats are designed to take care of an unrestrained occupant until its 20 to 25 miles an hour. After that, you have to remember to have a belt on, and the belt would take you up to say 35 miles per hour and then, after that, the seat and the seat belt will not help you any.
The gist of plaintiff's failure to warn theory was that Volkswagen's seat was designed to yield or decline in a high speed rear-end collision and that the seat belt system was to protect occupants by their "hindering" effect. Seat belts were thus an integral component of defendant's seat design. Plaintiff asserted that, although defendant designed the front seat to yield and relied upon the lap and shoulder harnesses to protect the driver upon impact, Volkswagen failed to apprise users of the necessity of wearing seat belts. To meet the defense presented by Volkswagen, plaintiff asserted that defendant failed to advise a user of the automobile of the known tendency of the seat to collapse and the consequent severe injuries if the seat belt system was not used. The jury heard evidence that Volkswagen knew prior to the 1977 accident that its seats would deform, that they were designed to yield upon impact, and that occupants would be hurled to the back of the car if they were not wearing a seat belt.
In our view, these proofs created a jury question whether defendant failed to warn users of the dangers attributable to not wearing seat belts. Although plaintiff, in his own case, did not establish that his injuries would not have occurred had defendant provided an adequate warning, Volkswagen supplied this evidence in the course of its defense. Once the defense presented this evidence, "the judge was constrained to consider [it] in determining the sufficiency of plaintiff's case." Castro v. Helmsley Spear, Inc., 150 N.J. Super. 160, 164, 375 A.2d 274 (App.Div. 1977); see also Joseph Hilton & Assocs., Inc. *563 v. Evans, 201 N.J. Super. 156, 166, 492 A.2d 1062 (App.Div. 1985); Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 53, 433 A.2d 801 (App.Div. 1981).
The evidence, taken in its entirety, was sufficient to establish a prima facie case. Our courts have long recognized that a product may be defective by the absence of a warning. See Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 242, 432 A.2d 925 (1981). In testing the need and adequacy of a warning, "the manufacturer is deemed to know the dangerousness of the product." Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 205, 485 A.2d 305 (1984). It is with that knowledge assumed that the manufacturer's conduct is to be gauged. Ibid. See also Feldman v. Lederle Laboratories, 97 N.J. 429, 449, 479 A.2d 374 (1984). The adequacy of the warning is to be evaluated in terms of what the manufacturer actually knew and what he "should have ... known based on information that was reasonably available or obtainable...." Feldman v. Lederle Laboratories, 97 N.J. at 452, 479 A.2d 374. A manufacturer has a duty to warn users of "all hidden or latent dangers that would arise out of a reasonably anticipated use of its product." Campos v. Firestone Tire & Rubber Co., 98 N.J. at 206, 485 A.2d 305. A duty to warn of dangers inherent in a product's use arises "because a warning could make [the product] safer at virtually no added cost and without limiting its utility." Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 402, 451 A.2d 179 (1982), quoting Freund v. Cellofilm Properties, Inc., 87 N.J. at 242, 432 A.2d 935. A duty to warn is not automatically extinguished because the injured user perceived the danger. Michalko v. Cooke Color & Chem. Corp., 91 N.J. at 402, 451 A.2d 179. A user's decision to proceed with awareness of the danger but in the absence of an adequate warning addresses the issue of proximate cause. Ibid.; Campos v. Firestone Tire & Rubber Co., 98 N.J. at 207, 485 A.2d 305.
We find it entirely plausible that where a manufacturer relies upon seat belts to make its product safe, it has an obligation to *564 apprise users of the heightened and not obvious danger its seat design presents if the seat belts are not worn. Here, enough was presented from which the jury could reasonably have concluded that the lack of warnings proximately caused plaintiff's injuries. As we pointed out previously, plaintiff apparently believed that the use of seat belts tended to enhance injuries caused by a collision. We are not concerned here with "the user of a product [who] knows at the moment of [its] use the very danger of which the warning would have apprised him...." Vallillo v. Muskin Corp., 212 N.J. Super. 155, 159, 514 A.2d 528 (App.Div. 1986). Proper warnings might have reduced the risk of injury. The trial court properly submitted that question to the jury.

VII.
Defendant next contends that the trial court erred by (1) failing to apply the formula set forth in Waterson v. General Motors Corp., 111 N.J. 238, 544 A.2d 357 (1988), in assessing plaintiff's comparative negligence, and (2) refusing to reduce the damages awarded by the jury by 25%. We consider the issues in inverse order.

A.
Although we will discuss Waterson later in our opinion, we first address defendant's claim that the trial court erred by failing to mold the jury's verdict on damages by the percent of plaintiff's negligence in failing to use seat belts. We are convinced that in the context of plaintiff's failure to warn claim, contributory negligence was not available as a defense. Thus, whether or not the trial court erred by failing to utilize the Waterson formula, no prejudice resulted. By the same token, the trial court was correct in refusing to reduce damages by plaintiff's percentage of fault.
As we pointed out earlier, this second collision case is unique in that one of the defects alleged by plaintiff and *565 found by the jury was defendant's failure to warn of the special requirement that a seat belt be used in light of the collapsing seat, a feature built into the automobile by design. The jury decided that the Volkswagen was defective because defendant failed to warn of the special need to wear seat belts to guard against injuries above and beyond what the ordinary driver could reasonably anticipate sustaining. There can be no comparative negligence where the harm incurred is the very risk about which defendant had a duty to warn. See Bexiga v. Havir Mfg. Corp., 60 N.J. 402, 412, 290 A.2d 281 (1972). It would be anomalous to relieve a defendant of liability for a risk hidden to a foreseeable user. Clearly, the heightened risk from not using a seat belt in connection with the collapsing seat designed to yield upon impact was not reasonably discoverable to plaintiff. We previously noted that a duty to warn is not extinguished merely because the party injured was to some extent aware of the danger attributable to the use of a product. Michalko v. Cooke Color & Chem. Corp., 91 N.J. at 402, 451 A.2d 179. That principle is particularly significant here in light of plaintiff's subjective state of mind in misapprehending the benefits and dangers of using seat belts. Plaintiff should not be penalized for failing to take a precaution which a proper warning would have urged.

B.
In Waterson, our Supreme Court drew a sharp distinction between "first collision injuries" and "second collision injuries." 111 N.J. at 252, 544 A.2d 357. "[F]irst collision injuries" are those "that would have occurred irrespective of whether or not the injured party used a seat belt." Ibid. In this context, "second-collision injuries" are those "that the use of a seat belt arguably could prevent." Ibid. In making this demarcation, the Court recognized that often a plaintiff's injuries arise from two separate and distinct collisions. Id. at 264, 544 A.2d 357. Consequently, "the relevant inquiry is not whether the failure to use a seat belt contributed to the cause of the accident but *566 whether the nonuse of a seat belt contributed to plaintiff's injuries." Ibid. Central to the holding in Waterson is the principle that jurors must understand the distinction between the two events, and that "[w]earing seat belts has relevance only with respect to the `second collision.'" Ibid., quoting Dunn v. Durso, 219 N.J. Super. 383, 395, 530 A.2d 387 (Law Div. 1986). In assessing the effect of nonuse of seat belts, the Court alluded to N.J.S.A. 39:3-76.2f, the mandatory seat belt law. However, the Court held that "even after the enactment of the mandatory seat belt law ... failure to use a seat belt is not negligence per se." 111 N.J. at 263, 544 A.2d 357. According to the Court, the better rule is to require the factfinder to "determine whether an injured party's nonuse of a seat belt should serve to reduce that party's recovery and not simply whether the party's conduct has met an established standard of care." Id. at 266, 544 A.2d 357. The Court concluded that "nonuse of a seat belt does not constitute contributory negligence sufficient to bar a recovery in strict liability." Id. at 268, 544 A.2d 357. Rather, "modified principles of comparative fault should apply to reduce a plaintiff's recovery for seat-belt damages." Ibid. The Court determined that a defendant should be permitted to present the issue of seat belt use to the jury where it introduces satisfactory evidence that plaintiff's failure to use a seat belt increased the extent or severity of the injuries sustained. Ibid. However, total damages for all injuries should not be indiscriminately reduced to reflect nonuse of seat belts.
Instead, the Court sought to segregate seatbelt damages from those resulting from the original collision. The Court created a formula designed to isolate the damages and fault attributable to a plaintiff's failure to wear a seat belt. Id. at 271, 544 A.2d 357. The equation adopted by the Court involves the following steps:
(1) The jury determines total damages as if there were no seat belt issue at all.
(2) The jury determines the comparative fault of each party in causing the accident and expresses those determinations in terms of a percentage (e.g., *567 General Motors for the defective axle and plaintiff for any applicable negligence on her part, such as if it could be shown that she knew of the defective axle and drove anyway or that she drove inattentively and at an excessive rate of speed).
(3) The jury determines whether plaintiff's nonuse of a seat belt increased the extent or severity of plaintiff's injuries and whether plaintiff's nonuse of a seat belt constituted negligence.
(4) The jury determines plaintiff's second-collision injuries, or seat-belt damages.
(5) The jury determines the percentage of plaintiff's comparative fault for the second-collision injuries or seat-belt damages. The court should inform the jury that plaintiff's fault for failure to wear a seat belt will be added to plaintiff's fault, if any, in causing the accident to reduce further plaintiff's award in an amount proportionate also to defendant's relative fault in causing the accident.
(6) The court determines plaintiff's recovery by molding the jury's damages and negligence findings. Id. at 274, 544 A.2d 357.
This formula serves to reduce a plaintiff's recovery without providing a windfall to manufacturers. However, this case is somewhat unique because the only damages at issue were those that resulted from the "second collision." Stated somewhat differently, the only damages recoverable were "seat belt damages."
We stress that the parties agreed at the outset of the trial plaintiff's comparative negligence in causing the original accident had no bearing on this case. See Crispin v. Volkswagenwerk, A.G., 96 N.J. at 346, 476 A.2d 350. Defendant's attorney maintained that position throughout the trial. Indeed, when the proposed verdict sheet was discussed, defendant's counsel pointed to the differences between this case and Waterson and stated "[w]e don't have to concern ourselves with the ramifications of what caused the accident." Since defendant took the view throughout that there was no need to apportion damages between those caused by the initial impact and those resulting from the collapse of the seat, that aspect of Waterson which accounts for plaintiff's negligence in originally causing the accident was not involved here. By reason of the arguments advanced by the parties, the issue of plaintiff's negligence in causing the accident was not submitted to the jury. Defendant should not be permitted to demand that a course of action be *568 taken and then condemn the very procedure it sought and urged. Given the unique context and defendant's agreement with the court's actions at trial, we are satisfied that plaintiff's negligence in causing the original accident was not at issue. We find no reversible error in the trial court's failure to apply the Waterson formula to the facts of this case.

VIII.
We next consider defendant's argument that the trial court erred by refusing to allow it a credit for the amount of the settlement in the Union County litigation. In our recital of the facts, we described in detail the procedural context in which this case was tried. In affirming the Essex County and Bergen County orders and remanding for trial, our Supreme Court emphasized the duty of the Law Division to create safeguards to insure that defendant suffer no prejudice by reason of plaintiff's former attorney's improper trial tactics. Crispin v. Volkswagenwerk, A.G., 96 N.J. at 345-346, 476 A.2d 250. The Court stated that the Law Division was required to "carefully mould its procedures so that Volkswagen's liability is appropriately limited," and that "[p]roper credit must be afforded for the recovery previously allowed." Id. at 346, 476 A.2d 250. Defendant asserts that the trial court was obliged by reason of this language to give it a pro tanto credit equal to the present value of the prior settlement. We disagree.
It is plain from our reading of the record that the trial court moulded its procedures to insure the jury compensated plaintiff only for second collision injuries. In that respect, the court applied the rigorous standards of Huddell v. Levin, 537 F.2d at 737-738, which require the plaintiff to prove what injuries, if any, would have resulted had an alternative, safer design been used, and offer some method of establishing the extent of enhanced injuries attributable to the defective design. See also Caiazzo v. Volkswagenwerk, A.G., 647 F.2d 241 (2d Cir.1981). We note that the rule, first announced in Huddell *569 placing the burden on the plaintiff to establish the extent to which the design defect enhanced his injuries has been widely criticized. Many jurisdictions impose the burden of apportioning injuries on the defendant. See Shipp v. General Motors Corp., 750 F.2d 418 (5th Cir.1985); McLeod v. American Motors Corp., 723 F.2d 830 (11th Cir.1984); Mitchell v. Volkswagenwerk, A.G., 669 F.2d 1199 (8th Cir.1982); Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir.1968); Fouche v. Chrysler Motors Corp., 103 Idaho 249, 646 P.2d 1020 (1982); Lahocki v. Contee Sand & Gravel Co., 41 Md. App. 579, 398 A.2d 490 (1979), rev'd on other grounds, 286 Md. 714, 410 A.2d 1039 (1980); Lee v. Volkswagen of America, Inc., 688 P.2d 1283 (Okla. 1984). In Crispin v. Volkswagenwerk, A.G., our Supreme Court alluded to these differing views, but did not resolve the issue. 96 N.J. at 346, 476 A.2d 250. Similarly, in Waterson v. General Motors Corp., the Court emphasized the distinction between first collision injuries and second collision injuries, but did not decide which party has the burden of apportionment.[1] 111 N.J. at 252, 544 A.2d 357. The point to be stressed here is that the trial court accepted the Huddell approach and placed the burden on the plaintiff to isolate and establish second collision injuries and the consequent damages. We are thus assured that the damages awarded by the jury compensated plaintiff only for the enhanced injuries resulting from defendant's defective design and failure to warn.
Under these circumstances, we will not speculate on whether any portion of the prior settlement was intended to cover second collision injuries. We discern no sound basis to give the defendant a windfall by assuming that the settling defendants *570 intended to compensate plaintiff for injuries caused by the defective Volkswagen.
One further matter deserves note. After our Supreme Court's decision in Crispin v. Volkswagenwerk, A.G., R. 4:5-1 was amended to require each party to include with the first pleading a certification as to whether the matter in controversy is the subject of any other action pending in any court or of a pending arbitration proceeding, or whether any other related action is pending. If so, the certification must identify such actions and the parties involved. Ibid. Under the rule, each party has the continuing duty to serve an amended certification if there is any change in the facts. Ibid. In 1989, the Supreme Court rendered its decision in Cogdell v. Hospital Center at Orange, 116 N.J. 7, 560 A.2d 1169 (1989), holding that the entire controversy doctrine embraces not only the joinder of related claims, but also a joinder of all persons who have a material interest in the controversy. Id. at 26, 560 A.2d 1169. In light of these developments, it is extremely unlikely that the procedural problems that beset us in this appeal will recur in the future.
Nevertheless, the problem of how to treat settling tortfeasors in the context of a case involving first collision injuries and second collision injuries will undoubtedly arise. In light of the sharp distinction between first collision injuries and second collision injuries drawn in Waterson, difficult issues are presented concerning how a settlement between one or more of the parties should be treated. One possible solution is to require the settling parties to express their intention whether or to what extent the amount of the settlement is to cover first collision or second collision injuries. However, factual and legal issues in the context of settlement negotiations are rarely so clear-cut as to permit a realistic apportionment of the settlement amount. Moreover, the settling parties will generally have an interest in placing most of the fault on the non-settling party. The non-settling party should not be bound by an agreement in which he was not a participant.
*571 Perhaps the best approach is reflected in Rogers v. Spady, 147 N.J. Super. 274, 371 A.2d 285 (App.Div. 1977), and its progeny, see, e.g., Young v. Latta, 233 N.J. Super. 520, 524, 559 A.2d 465 (App.Div. 1989); Tefft v. Tefft, 192 N.J. Super. 561, 566, 471 A.2d 790 (App.Div. 1983); Dimogerondakis v. Dimogerondakis, 197 N.J. Super. 518, 522, 485 A.2d 338 (Law Div. 1984); see also Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 569, 410 A.2d 674 (1980). These decisions stand for the proposition that "when a claimant settles with a codefendant, that percentage of negligence found attributable to the settling codefendant will be deducted from the verdict returned against the other codefendants found liable., i.e., the remaining joint tortfeasors will be liable for that percentage of negligence attributable to them." Rogers v. Spady, 147 N.J. Super. at 277, 371 A.2d 285. In a case involving first collision injuries and second collision injuries, the Waterson formula would be applied, for example, even where all defendants responsible for the initial collision have settled. Although the procedure proposed here would undoubtedly complicate and add to the issues in a trial of the non-settling defendant, this method would yield a fair and accurate assessment of the fault and damages attributable to the settling "first collision" defendants.
In light of the result we have reached, we need not consider the matter further. We leave these questions for another day.

IX.
Plaintiff's arguments in the cross-appeal clearly lack merit. R. 2:11-3(e)(1)(E). Under the unusual circumstances of this case, we find no error in the trial court's suspension of prejudgment interest for the period prior to the Supreme Court's ruling in Crispin v. Volkswagenwerk, A.G. See Kotzian v. Barr, 81 N.J. 360, 364, 408 A.2d 131 (1979); Bak-A-Lum Corp. v. Alcoa Building Products, 69 N.J. 123, 131, 351 A.2d 349 (1970); Chattin v. Cape May Greene, Inc., 216 N.J. Super. 618, 644, 524 A.2d 841 (App.Div. 1987), certif. den. 107 N.J. 148, 526 A.2d *572 209 (1987); Dall'ava v. H.W. Porter Co., 199 N.J. Super. 127, 131, 488 A.2d 1036 (App.Div. 1985). The trial court correctly decided that medical and rehabilitative expenses were not recoverable. See N.J.S.A. 39:6A-12. The court properly dismissed plaintiff's claim for punitive damages.
Affirmed.
NOTES
[1] A rule placing upon the defendant the burden of proof with respect to the apportionment of damages may be more in line with our Supreme Court's recent decision in Scafidi v. Seiler, 119 N.J. 93, 111-113, 574 A.2d 398 (1990). See also Fosgate v. Corona, 66 N.J. 268, 272-273, 330 A.2d 355 (1974). However, this issue is not before us and we need not resolve it.