Larry P. McWILLIAMS, Jr. and Larry
P. McWilliams, Sr., Plaintiffs,

v.

YAMAHA MOTOR CORPORATION USA
and D.T. Van Sice, Inc., Defendants/Third Party Plaintiffs,

v.

Albert A. FEISE, Third
Party Defendant.

Civ. A. No. 89-2331 (AJL).

United States District Court,
D. New Jersey.

Nov. 20, 1991.

Paul R. Melletz, Paul R. Melletz, P.A., Cherry Hill, N.J., for plaintiffs.

Robert J. Kelly, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, N.J., for defendant/third party plaintiff.

Robert J. Borrelle, Burnt Mill and Laurel Woods Voorhees, N.J., for third party defendant.

## OPINION

LECHNER, District Judge.

This is a personal injury action brought by plaintiffs Larry P. McWilliams, Jr. ("McWilliams") and his father Larry P. McWilliams, Sr. ("McWilliams Sr.") (collectively, the "Plaintiffs") against defendants Yamaha Motor Corporation, U.S.A. ("Yam-

aha") and D.T. Van Sice, Inc. ("Van Sice") (collectively, the "Defendants"). Yamaha has filed a third party complaint against Albert Feise ("Feise"). Jurisdiction is alleged pursuant to 28 U.S.C. § 1332.

Currently before the court is the motion of Yamaha for summary judgment pursuant to Fed.R.Civ.P. 56 on the ground that no basis for strict liability exists under New Jersey law against Yamaha.[1] For the reasons set forth below, the motion for summary judgment is granted and the complaint is dismissed in its entirety.

*Facts*

On 31 May 1987 McWilliams was operating his 1982 Yamaha Virago motorcycle (the "Virago") eastbound on County Road 625 ("Route 625"), near the Garden State Parkway, Exit Ramp 17. Amended Joint Final Pre–Trial Order, Part II, ¶ 5 ("Am. Jt. FPT Order"). McWilliams resides in Carney's Point, New Jersey. *Id.,* ¶ 1. Feise parked his car on the right side of eastbound Route 625. Am. Jt. FPT Order, ¶ 6. As McWilliams was approaching Feise's car, Feise attempted to make a U-turn and struck McWilliams. *Id.,* ¶ 7. The front bumper of Feise's car hit the lower right leg of McWilliams. Complaint, filed 26 May 1989, ¶ 10 (the "Complaint"). The lower right leg of McWilliams was pinned between the projection of the bumper and the Virago and was almost completely severed.[2] *Id.* Subsequently, McWilliams' right leg was amputated. *Id.*

---

1. In support of the motion for summary judgment, Yamaha has submitted the following: Brief in Support of Motion for Summary Judgment ("Moving Brief"); Letter Reply Brief ("Reply Brief") and letter to court, dated 29 October 1991 (the "29 October Letter").

In opposition to the motion for summary judgment, Plaintiffs have submitted the Brief in Opposition of Motion for Summary Judgment ("Opp. Brief") and letter to court, dated 30 October 1991 (the "30 October Letter"). Third Party Defendant, Albert A. Feise has submitted a letter, dated 19 September 1991, in which he adopts the arguments set forth in the Opp. Brief.

Although the motion was made by Yamaha, the 29 October Letter stated: "that counsel have ... stipulated that ... [the] rulings [in this motion] should apply to all claims by plaintiffs against D.T. Van Sice, Inc., the distributor of the subject motorcycle, for whom [counsel for Yamaha] was recently substituted as counsel." 29

October Letter. The 30 October Letter did not object to the inclusion of Van Sice in the court's rulings on this motion. Therefore, this motion is deemed to be made by both Yamaha and Van Sice.

2. In his deposition testimony, McWilliams testified:

> I think it was just a clean hit with my leg and the bumper and the motorcycle might have been—the motor might have hit my leg or whichever and my leg acted as a barrier in between the motorcycle and the car. If my leg hadn't been there in the first place then the motorcycle might have hit the bumper. If I would have lifted my leg it could have went any other way.
>
> ....
>
> I am pretty positive [the bumper] just severed [my right leg] right off.

On that same day, McWilliams, Sr. was on his way to Sea Isle City, New Jersey, via eastbound Route 625. *Id.*, ¶ 9. About ten minutes after the accident, he came upon the scene of the accident on Route 625. *Id.*, ¶¶ 9–10. McWilliams, Sr. saw his son lying on the ground with his lower right leg almost completely severed. *Id.*, Count Four, ¶ 5. McWilliams, Sr. also saw people administering aid to his son. *Id.*, ¶ 4. The Complaint alleges as a result of seeing his son's injuries, McWilliams, Sr. suffered mental and emotional distress. *Id.*, ¶ 6.

McWilliams purchased his Virago at Van Sice. Van Sice is an authorized Yamaha dealer and is a Delaware corporation with its principal place of business in Wilmington, Delaware. *Id.*, ¶¶ 3, 8. McWilliams purchased his Virago in 1986, brand new; however, the Yamaha was a leftover 1982 model. *Id.*, ¶ 8. The Virago was manufactured and assembled by Yamaha. *Id.*, ¶ 9. The Virago did not contain any lower limb protective guards or crash bars. Opp. Brief, Ex. A, 10. Crash bars are tubular steel bars attached to the frame of the motorcycle to protect the rider's legs in the event of a collision. At the time Yamaha manufactured the Virago, crash bars were available. Opp. Brief, Ex. B., 8.

Prior to purchasing the Virago, McWilliams had experience in operating motorcycles and minibikes. McWilliams first began to operate minibikes when he was thirteen or fourteen years old. Moving Brief, Ex. A, 38 ("McWilliams Dep."). Several of McWilliams' friends owned minibikes which McWilliams would operate. *Id.* McWilliams neither took lessons to operate a motorcycle nor did he take a motorcycle safety course prior to buying his first motorcycle. *Id.*, 47. He did read the owner's manual to his first motorcycle. In 1986 McWilliams traded that motorcycle in for the Virago. *Id.*, 48. McWilliams was twenty-two at the time of the accident. Opp. Brief, Ex. B., 3.

Two expert reports, both addressed to Plaintiffs, were prepared for this litigation. The report prepared by Harry C. Peterson, Ph.D. ("Peterson"), stated the "subject accident ... is a common, foreseeable motorcycle accident which is a well-known facet of the operational environment...." Opp. Brief, Ex. A, 6 (the "Peterson Report"). Indeed, McWilliams concedes in his brief that there is a "very high probability of severe leg injuries in a wide variety of motorcycle accidents." Opp. Brief, 3.

The report prepared by George P. Widas stated that various publications and reports indicated: "Side impact with another motor vehicle was an entirely foreseeable design condition arising from the environment in which motorcycles operate." *Id.*, Ex. B, 8 (the "Widas Report"). McWilliams characterizes motorcycles as a means to have "economical, open-air, maneuverable form of transportation...." *Id.*, 9. In addition, Yamaha states: "[McWilliams] had personally owned two motorcycles and became aware of the existence and purpose of leg protection devices or 'crash bars' at the time of his first motorcycle purchase." Moving Brief, 4 (citing McWilliams Dep., 43, 48).

Two complaints have been filed in this action. On 26 May 1989 Plaintiffs filed the Complaint in this court against the Defendants. Complaint. On 30 May 1989 Plaintiffs filed a complaint in the Superior Court of New Jersey (the "New Jersey Complaint") against Yamaha. The New Jersey Complaint was removed to this court.[3]

Count One of the Complaint alleges that the Defendants "knew or should have known of the likelihood of a hazard for lower limit [sic] injury in the event of a collision with a motor vehicle." *Id.*, Count One, ¶ 11. The Complaint states that the Defendants could have mitigated lower limb damages by effective and feasible de-

McWilliams deposition testimony, 137 (attached to Opp. Brief, but not marked as an exhibit).

**3.** The only difference between the Complaint and the New Jersey Complaint is that Van Dice is named as a defendant in the Complaint. Because the claims asserted in the New Jersey Complaint are the same as the claims asserted in the Complaint, for the purpose of clarity, this opinion will make references to the Complaint only.

signs, known as crash bars. *Id.*, ¶ 12. The Complaint further alleges because there was not a crash bar on the Virago, the Virago was of a defective design. *Id.*, ¶ 14. Count One alleges that the Defendants are negligent because of their failure to give warnings regarding the unsafe conditions arising from the lack of a crash bar. *Id.*, ¶ 15.

Count Two of the Complaint asserts a claim for strict liability. Count Two states because Defendants manufactured, assembled, distributed and sold to McWilliams the allegedly defective and therefore unreasonably dangerous Virago, the Defendants are strictly liable. *Id.*, Count Two, ¶ 2. Count Three is against the Defendants for a breach of implied warranty of merchantability pursuant to N.J.S.A. 12A:2–314. *Id.*, Count Three, ¶ 2. Counts Four, Five and Six are derivative claims brought by McWilliams, Sr. for mental and emotion distress on the basis of negligence, strict liability and breach of implied warranty of merchantability. *Id.*, 6–7.

On 30 October 1989 Yamaha filed a third party complaint (the "Third Party Complaint") against Feise. Third Party Complaint. Yamaha asserts claims for indemnification and contribution against Feise on the ground that Yamaha is not strictly liable and that Feise negligently operated his car. Third Party Complaint, 3–4.

*Discussion*

Yamaha moves for summary judgment on the ground that it is not strictly liable. Yamaha contends there can be no design defect or failure to warn claim because the risk of leg injury while operating a motorcycle is an open and obvious risk to the ordinary consumer or is a known danger. Moving Brief, 5–17. The Plaintiffs argue there is a genuine issue of material fact as to whether a motorcycle not equipped with crash bars has a design defect. Opp. Brief, 6–12.

A. *Summary Judgment Standard of Review*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any materi-al fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see Nathanson v. Medical College*, 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir. 1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Joseph v. Hess Oil*, 867 F.2d 179, 182 (3d Cir.1989). " 'Any "unexplained gaps" in material submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and

footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied*, —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *see* Fed.R.Civ.P. 56(e); *see also Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case"); *Carlson v. Arnot-*

*Ogden Memorial Hosp.*, 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor").

### B. *Defective Product*

■ Yamaha argues the New Jersey Products Liability Law, N.J.S.A. 2A:58C-1–7 (the "Products Liability Law"), applies in this action. Moving Brief, 6–9. The Plaintiffs, however, argue the Products Liability Law is inapplicable to this case because it was not effective until 22 July 1987. Opp. Brief, 6–7. Plaintiffs state the accident occurred on 31 May 1987. Plaintiffs also point out that the Virago was purchased in 1986 and manufactured in 1982. Plaintiffs argue because the cause of action accrued before the effective date of the Products Liability Law, it cannot be applied to this action. *Id.*

The New Jersey Supreme Court dealt with the issue of the effective date of the Products Liability Law in *Dewey v. R.J. Reynolds Tobacco Co.*, 121 N.J. 69, 94–95, 577 A.2d 1239 (1990). In that case, the court looked to the language of the Products Liability Law and the legislative history of the law. The court held the Products Liability Law is "not to be applied to products-liability actions *instituted* on or before the date of enactment...." *Dewey*, 121 N.J. at 95, 577 A.2d 1239 (citing N.J.S.A. 2A:58C–3, historical note L.1987, c. 197, § 8) (emphasis added); *see also, Tirrell v. Navistar Int'l, Inc.*, 248 N.J.Super. 390, 398, 591 A.2d 643 (App.Div.1991).

Notwithstanding the holding in *Dewey* and the fact that this action was instituted after the date of enactment of the Products Liability Law, the Plaintiffs argue the date of the accrual of the cause of action is the controlling date. Opp. Brief, 6–7. Given the holding of *Dewey* and the clear meaning of the legislative history of the law, the Plaintiffs' claim is unwarranted. The Complaint was *instituted* in May 1989; accordingly, the Products Liability Law, effective 22 July 1987, is applicable to this action. *See e.g., Tirrell*, 248 N.J.Super. at 398, 591 A.2d 643 (Products Liability Law applied to complaint filed 17 September 1987 for inju-

ries arising out of accident that occurred on 12 November 1986).

■ Presently, there are no New Jersey cases which apply section three of the Products Liability Law. When a federal court is faced with a state statute that has not been interpreted, it must "predict how the New Jersey Supreme Court would rule if presented with this case." *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 489 (3d Cir.1991); *see also, National–Standard Co. v. Clifton Ave. Corp.*, 775 F.Supp. 151, 157–158 (D.N.J.1991). "In predicting how the highest state court would decide an issue, the federal court may look to analogous state court cases, treatises, restatements and law review articles." *Id.; Aetna Casualty & Surety Co. v. Farrell*, 855 F.2d 146, 148 (3d Cir.1988).

The purpose of strict products liability is to "eliminate the necessity for proving negligence when injury is caused by a defective product." *Mahoney v. Carus Chem. Co.*, 102 N.J. 564, 581 (1986). Strict products liability imposes a duty upon a manufacturer to "make sure that its manufactured products placed into the stream of commerce are suitably safe when used for their intended or reasonably foreseeable purposes." *Soler v. Castmaster, Div. of H.P.M. Corp.*, 98 N.J. 137, 144–45 (1984); *see also, Spring Motors Distrib., Inc. v. Ford Motor Co.*, 98 N.J. 555, 567 (1985); *Suter v. San Angelo Foundry & Mach. Co.*, 81 N.J. 150, 169, 406 A.2d 140 (1979).

Three theories for products liability exist at common law: manufacturing defects, design defects and warning defects. *See e.g., Fischer v. Johns–Manville Corp.*, 103 N.J. 643, 653–55, 512 A.2d 466 (1986) (failure to warn); *Michalko v. Cooke Color & Chem. Corp*, 91 N.J. 386, 394, 451 A.2d 179 (1982) (design defect); *Suter*, 81 N.J. at 150, 406 A.2d 140 (manufacturing defect). These theories have been codified in the Products Liability Law. N.J.S.A. 2A:58C–1, N.J. Senate Judiciary Committee Statement. "The new statute ... establishes new rules regarding the burden of proof and the imposition of liability" with respect to strict liability claims. *Dewey*, 121 N.J. at 95, 577

A.2d 1239. The legislative history of the Products Liability Law indicates it was

intended to establish clear rules with respect to specific matters as to which the decisions of the courts in New Jersey have created uncertainty, while reserving the concept that manufacturers may be held strictly liable for harm caused by products that are defective.

N.J.S.A. 2A:58C–1, N.J. Senate Judiciary Committee Statement.

Section two sets forth the basis for a cause of action in products liability. It provides, in pertinent part:

A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was *not reasonably fit, suitable or safe for its intended purpose* because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. *failed to contain adequate warnings* or instructions, *or c. was designed in a defective manner.*

*Id.*, at 2A:58C–2 (emphasis added).

Under common law principles of proving strict liability for design defect, the plaintiff has to show "(1) the product design was defective; (2) the defect existed when the product was under the control of and distributed by defendant; and (3) the defect caused injury to a reasonably foreseeable user." *Soler*, 98 N.J. at 145, 484 A.2d 1225; *see also O'Brien v. Muskin Corp.*, 94 N.J. 169, 179, 463 A.2d 298 (1983).

Section 3(a) provides a defense for manufacturers and sellers for harms caused to the plaintiff by products if:

The characteristics of the product are known to the ordinary consumer or user, and the harm was caused by an unsafe aspect of the product that is an inherent characteristic of the product and that would be *recognized by the ordinary person who uses or consumes the product with the ordinary knowledge com-*

*mon to the class of persons for whom the product is intended....*

N.J.S.A. 2A:58C–3(a)(2) (emphasis added). Although the Products Liability Law was not applied in *Dewey*, the court did analyze the effect of the law. As explained by the *Dewey* court, section 3(a)(2) "combines the 'consumer expectations' doctrine for determining whether a product is defective, with the obvious-danger factor of the risk-utility analysis to create a defense to a design-defect claim." 121 N.J. at 96, 577 A.2d 1239 (citations omitted).

Section 3(a)(2) was intended, in part, to adopt the "consumer expectations" test established by comment i to section 402A of the Restatement (Second) of Torts (the "Second Restatement") and recognized by New Jersey courts.[4] *Id.* The consumer expectations test "recognizes that there are many common products ... whose use necessarily involves some risk of harm ... but the product is not for this reason 'defective.'" N.J.S.A. 2A:58C–1, N.J. Senate Judiciary Committee Statement. However, as indicated by one commentator, the language of section 3(a)(2) is worded as an "obvious danger" test. *See* W. Dreier, H. Goldman & D. Farer, *Products Liability and Toxic Tort Law in New Jersey: A Practitioner's Guide*, at 133 (6th ed. 1988). The obvious danger test has been articulated by Prosser as follows:

> One limitation commonly placed upon the ... seller's entire liability, is that he is not liable for dangers that are known to the user, or are obvious to him or are so commonly known that it can reasonably be assumed that the user will be familiar with them. Thus, there is certainly no usual duty to warn the purchaser that a knife or an axe will cut, a match will take fire, dynamite will explode or a hammer may mash a finger.

Prosser, *Law of Torts* 96 (4th ed. 1971).

Prior to the enactment of the Products Liability Law, New Jersey courts applied the "consumer expectations" doctrine and the "risk utility" doctrine to determine whether a product was defective. *See e.g., O'Brien*, 94 N.J. at 181–82, 463 A.2d 298. In *O'Brien*, the court stated the consumer expectations test "recognizes that the failure of the product to perform safely may be viewed as a violation of the reasonable expectations of the consumer." 94 N.J. at 182, 463 A.2d 298 (citing *Suter*, 81 N.J. at 170–71, 406 A.2d 140).

■ The risk utility analysis involves a "comparison of the utility of the product with the risk of injury that it poses to the public...." *O'Brien*, 94 N.J. at 181, 463 A.2d 298. The consumer expectations standard is in effect incorporated as one of the considerations under the risk utility analysis. Indeed, one of the factors relevant in the risk utility analysis is "[t]he user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product...." *Id.* at 182, 463 A.2d 298. Nevertheless, under *O'Brien*, the consumer's expectation was only a relevant factor, not an absolute defense to a design defect claim. *Dewey*, 121 N.J. at 96, 577 A.2d 1239. The major change in the law, therefore, is that the open and obvious analysis which was just an aspect of the risk utility analysis is now a complete defense to products liability claims under the Products Liability Law. W. Drier, G. Goldman and D. Farer, *supra* at 134; *see also Dewey*, 121 N.J. at 96–97, 577 A.2d 1239 (" 'obvious danger' has now been transformed into a defense, except in instances involving industrial machinery or other workplace equipment").

The nature of the open and obvious danger defense must be analyzed. The open and obvious danger analysis has only been treated in New Jersey courts to the extent it was an element of the risk utility analysis. Accordingly, it is necessary to look to the decisions of other jurisdictions for guidance to determine how the New Jersey

---

4. Comment i of the Second Restatement states a product is unreasonably dangerous when:

The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

Second Restatement, § 402A, comment i.

Supreme Court would choose to apply the open and obvious danger defense. *See Gruber v. Owens–Illinois Inc.*, 899 F.2d 1366, 1369–70 (3d Cir.1990); *National–Standard*, 775 F.Supp. at 157–158.

The facts in *Toney v. Kawasaki Heavy Indust., Ltd.*, 763 F.Supp. 1356 (S.D.Miss. 1991), are on point with the facts in this action. In *Toney*, plaintiff's leg was amputated as a result of being struck from the side by a truck when he was operating his motorcycle. *Id.*, at 1358. Plaintiff brought a strict liability action against the manufacturer on the ground that the failure to provide leg protection on the motorcycle rendered it unreasonably dangerous. *Id.* Under Mississippi law, when applying the consumer expectations test, the court has to consider whether the product was " 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' " *Id.* (citations omitted).

Under this analysis, the *Toney* court held:

> [T]he dangers associated with motorcycles which are not equipped with leg guards or other leg protection features are so open and obvious that, as a matter of law, Plaintiff's strict liability claim is precluded.... The *ordinary consumer knows that a motorcycle without leg guards or other protective features would not afford leg protection in the event of a side-impact collision.* Accordingly, a motorcycle unequipped with leg guards or other protective features cannot, as a matter of law, be more dangerous than would be contemplated by the ordinary consumer.

*Id.*, at 1360 (emphasis added). The court declined to follow a prior decision of that court which held that "the question of whether the danger associated with a motorcycle unequipped with leg protection devices was open and obvious was one of fact." *Id.*, at 1361 (discussing *Satcher v. Honda Motor Co., Ltd.*, 758 F.Supp. 393 (S.D.Miss.1991)).

In *Shaffer v. AMF, Inc.*, 842 F.2d 893 (6th Cir.1988), plaintiff, who was operating a motorcycle, was injured when a car made a left turn into his path. *Id.*, at 893. Plaintiff asserted a products liability claim against the manufacturer of the motorcycle on the theory that it failed to include a warning on the motorcycle of the nature of accidents and injuries that can result from driving a motorcycle. *Id.*, at 894. The *Shaffer* court stated:

> A "casual looking over" of a motorcycle, let alone the experience of six years of riding, must reveal that a motorcycle offers no protection in an accident, that serious accidents can and do occur, and that there are risks of collisions with other vehicles.

842 F.2d at 897. In addition to the open and obvious risk of lower-leg injuries which is inherent in a motorcycle, the *Shaffer* court also considered as an added factor the fact that the plaintiff had six years of experience of operating motorcycles. *Id.* The court granted summary judgment on the ground that the dangers associated with operating a motorcycle are open and notorious. In this case, McWilliams conceded there is a very high probability of severe leg injuries in motorcycle accidents and that the accident in this case is a common foreseeable motorcycle accident. Opp. Brief, 3; Peterson Report, 6. Moreover, McWilliams had been operating minibikes or motorcycles for nine or ten years at the time of the accident. McWilliams Dep., 38.

State courts have reached the same result as the *Toney* and *Shaffer* courts. *See e.g., Kutzler v. AMF Harley–Davidson*, 194 Ill.App.3d 273, 141 Ill.Dec. 190, 550 N.E.2d 1236 (Ill.App.Ct.), *app. denied*, 132 Ill.2d 546, 144 Ill.Dec. 258, 555 N.E.2d 377 (1990) (court rejected claim asserted by plaintiff who received injuries to his left leg while operating motorcycle when car sideswiped him and who sued manufacturer arguing motorcycle had defective design because it lacked crash bars); *Miller v. Dvornik*, 149 Ill.App.3d 883, 103 Ill.Dec. 139, 143–44, 501 N.E.2d 160, 164–65 (1986) (court focused on whether motorcycle without optional safety devices performed in

manner reasonably expected given its natural and intended uses when it rejected claim of plaintiff, who suffered leg injury, when involved in accident with motorcycle without crash bar); *Hunt v. Harley–Davidson Motor Co.*, 147 Ga.App. 44, 248 S.E.2d 15 (1978) (court responded to plaintiff's claim that motorcycle had design defect because it did not have crash bars by stating manufacturer "is under no duty to guard against injury from a patent peril ....").

Plaintiffs seek to distinguish *Miller* on the ground that plaintiff in *Miller* did not allege the crash bars would have prevented his injury. Opp. Brief, 11. A similar argument was advanced in *Kutzler.* With respect to the pleadings, the *Kutzler* court stated: "[A]lthough the *Miller* court noted that plaintiff's failure to allege that crash bars would have prevented his injury rendered the complaint insufficient, that fact was not dispositive of the issue." 141 Ill. Dec. at 192–93, 550 N.E.2d at 1238–39. In *Miller*, aside from the sufficiency of the pleadings, the court concluded: "There is nothing circumspect about a motorcycle rider's vulnerability to injury in the event of a collision. The risks are patent." 103 Ill.Dec. at 143, 501 N.E.2d at 164. Moreover, the *Kutzler* court noted the emphasis on the pleadings "is not legally persuasive because it incorrectly places the emphasis on safety devices rather than on the product itself." *Id.*, 141 Ill.Dec. at 193, 550 N.E.2d at 1239 (citations omitted).

██ Plaintiffs also rely on the crashworthiness doctrine to oppose Yamaha's motion for summary judgment. Opp. Brief, 9–11. The crashworthiness doctrine imposes strict liability on a manufacturer for injuries sustained in an accident involving a design or manufacturing defect which enhanced the injuries but did not cause the accident. *Seese v. Volkswagenwerk, A.G.*, 648 F.2d 833, 839 (3d Cir.), *cert. denied*, 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981); *Larsen v. General Motors Corp*, 391 F.2d 495, 504–505 (8th Cir.1968).

The Appellate Division of the New Jersey Superior Court applied the crashworthiness doctrine in *Crispin v. Volkswagen- werk A.G.*, 248 N.J.Super. 540, 558, 591 A.2d 966 (App.Div.1991) to determine whether the seating design used in a Volkswagen Beetle was defective. The court stated that to prove crashworthiness "there must be proof of (a) a defective design actually utilized, (b) the existence of a safer, practicable alternative and (c) injuries which could have been prevented had the safer design been employed." *Id.*, at 558, 591 A.2d 966. The court found that the evidence introduced at trial was sufficient to show a defect in the seat design and that steel alloys to increase structural strength and three different seat designs presented reasonably feasible alternative designs. *Id.*, 558–60, 591 A.2d 966. The *Seese* court stated the "doctrine of crashworthiness ... pertains to whether or not the vehicle was properly designed to minimize, rather than enhance, injuries to occupants in an accident...." 648 F.2d at 839 n. 8.

In *Camacho v. Honda Motor Co.*, 741 P.2d 1240 (Colo.1987), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988), the court, elaborating on the considerations necessary under the crashworthiness doctrine, noted that the question posed by the crashworthiness doctrine with respect to a motorcycle "is not whether the vehicle was obviously unsafe but rather whether the degree of inherent dangerousness could or should have been significantly reduced." *Id.*, at 1248. The *Camacho* court did not grant summary judgment because there was conflicting expert testimony as to whether Honda could have provided crash bars without limiting the motorcycle's utility or altering its nature. *Id.*, at 1248.

██ Importantly, the doctrine of crashworthiness and the doctrine of consumer expectations are conflicting doctrines of law. *See Camacho*, 741 P.2d at 1250 (dissenting opinion). The crashworthiness doctrine focuses on the ability to include safety features; the Products Liability Law focuses on the consumer's expectations with respect to the open and obvious nature of the danger. Under the crashworthiness doctrine, open and obvious dangers

are not an absolute defense to a claim alleging an unreasonably unsafe product. *Id.*

The legislative history of the Products Liability Law specifically states it is "intended to establish clear rules with respect to specific matters as to which the decisions of the courts in New Jersey have created uncertainty...." N.J.S.A. 2A:58C–1, N.J. Senate Judiciary Committee Statement. Given the legislature's stated intent to adopt the consumer expectations test and the New Jersey Supreme Court's interpretation of the Products Liability Law in *Dewey*, it is unlikely the New Jersey Supreme Court would follow the *Crispin* court's application of the crashworthiness doctrine to determine whether a product is "not reasonably fit, suitable or safe for its intended purpose...." N.J.S.A. 2A:58C–2.

Plaintiffs' reliance on *Taylor v. American Honda Motor Co.*, 555 F.Supp. 59 (M.D.Fla.1982) (plaintiff properly stated strict liability claim under crashworthiness doctrine arising out of inadequate motorcycle headlight), *Nicolodi v. Harley-Davidson Motor Co.*, 370 So.2d 68 (Fla.Dist.Ct. App.1979) (crashworthiness doctrine provides that involvement in a collision is foreseeable and intended use of vehicle, including motorcycles) and *Camacho*, 741 P.2d at 1240 (crashworthiness standard, not open and obvious standard, is appropriate standard in Colorado for determining whether product is defective and unreasonably dangerous), is unwarranted.

In all likelihood, the New Jersey Supreme Court will rule that a motorcycle, a vehicle specifically designed as an open-air, easily maneuverable, light-weight vehicle, contains an open and obvious risk of lower-leg injury. Indeed, at oral argument, counsel for McWilliams agreed that motorcycles were designed especially for their maneuverability and speed. McWilliams recognizes the dangers inherent with riding an open-air vehicle. Moving Brief, 4; Opp. Brief, 9. Moreover, the Peterson Report states: "The subject accident ... is a common, foreseeable motorcycle accident which is a common, facet of the operational environment...." Peterson Report, 6; *see also* Widas Report, 8 ("Side impact with

another motor vehicle was an entirely foreseeable design condition arising from the environment in which motorcycles operate."). Significantly, McWilliams does not focus on the inherent risk of lower-leg injuries, but rather on Yamaha's duty to warn consumers of the danger and duty to install crash bars. Moving Brief, 7–12.

The focus of the defense in the Products Liability Law is on the dangers which are open and obvious to the ordinary consumer using the product for its intended use. As mentioned, McWilliams was aware of the purpose of crash bars prior to owning the Virago and his expert stated side impact collisions were foreseeable and a common aspect of motorcycle operation. *Id.*, 4; Peterson Report, 6. McWilliams would now have the court characterize the intended use of motorcycles as simply a means of transportation. Such a characterization, however, fails to consider the intended differences between a truck or an automobile and a motorcycle: a truck being a means for transportation and for carrying cargo; an automobile being an enclosed means for transportation and for carrying passengers and a motorcycle being a means for lightweight, fast, open-air, maneuverable transportation. To require a manufacturer to eliminate all the dangers associated with motorcycle accidents would require a manufacturer to deprive the motorcycle of its intended use and turn the motorcycle into an enclosed vehicle. The risk associated with being in an accident while operating a motorcycle is just as open and obvious as the risk associated with using a knife which could slip and cut a finger. *Shaffer*, 842 F.2d at 897. The Virago, as a matter of law, cannot be said to have a design defect because it did not have crash bars.

Significantly, as mentioned, McWilliams is not an unexperienced consumer. As indicated in *Shaffer*, a person experienced with the operation of motorcycles is even more aware of the open and obvious risks of lower-leg injuries inherent in the operation of motorcycles. 842 F.2d at 897. McWilliams was familiar with motorcycles; he had been operating them since he was thirteen or fourteen and owned a motorcycle prior to purchasing the Virago. As an

experienced operator of motorcycles, McWilliams was, at a minimum, an ordinary consumer who used the Virago for its intended purpose. Moreover, McWilliams was aware of the existence and intended purpose of crash bars.

■ Lastly, McWilliams argues the Products Liability Law is inapplicable to this action because section 3(a)(2) does not apply to dangers " 'posed by products such as machinery or equipment that can feasibly be eliminated without impairing the usefulness of the products,' because such dangers are not 'inherent.' " Opp. Brief, 10; 30 October Letter (citing N.J.S.A. [2A:]58C:3(a)(2), N.J. Senate Judiciary Committee Statement). As previously indicated, however, the danger of lower-leg injury is an inherent risk given the intended purposes of motorcycles. In addition, McWilliams states he purchased the Virago for recreational purposes. McWilliams Dep., 48. From the language and legislative history of the Products Liability Law, it is clear the New Jersey legislature did not intend the exception for machinery and equipment to apply to products purchased for recreational purposes. Indeed, one commentator stated that this exception is intended to preserve a line of cases requiring safety devices in industrial machinery. W. Dreier, H. Goldman, & D. Farer, *supra,* at App. E., 15–16 (citing *Michalko,* 91 N.J. at 386, 451 A.2d 179 (manufacturer who made custom design piece of equipment had to include safety device even though it was not in customer's design); *Cepeda v. Cumberland Eng'r Co.,* 76 N.J. 152, 386 A.2d 816 (1978) (manufacturer had duty to install permanent finger guard in pelletizing machine); *Bexiga v. Havir Mfg. Corp.,* 60 N.J. 402, 290 A.2d 281 (1972) (duty on manufacturer to install push button guard in tool and die machine)).

5. Section 4 of the Products Liability Law provides:
    In any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction.... An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances

## C. *Failure to Warn*

■ Yamaha argues that the Products Liability Law, likewise, applies to the Plaintiffs' claims for Yamaha's alleged failure to warn of the risks attendant with operating the Virago without crash bars. Moving Brief, 17. Plaintiffs concede section 4 of the Products Liability Law applies to claims based on the adequacy of warnings on a product. Opp. Brief, 12. Plaintiffs argue, however, Yamaha, as the manufacturer of the Virago, has a duty to warn of the need for leg protection. *Id.*

As previously stated, section two of the Products Liability Law provides for a products liability cause of action if a person has suffered injuries as a result of a product which was "not reasonably ... safe for its intended purposes because it ... failed to contain adequate warnings...." 2A:58C–2. Section 4 of the Products Liability Law defines "adequate warning" for purposes of section 2.[5] Section 3 states a defense available to the manufacturer if the "characteristics of the product are known to the ordinary consumer or user, and the harm was caused by an unsafe aspect of the product that is an inherent characteristic ... recognized by the ordinary person who uses or consumes the product...." *Id.,* 3(a)(2).

As was the case above, New Jersey state courts have not yet applied the Products Liability Law to a failure to warn claim. Therefore, it is appropriate to consider the decisions of other jurisdictions. In *Miller,* the court recognized that a "duty to warn exists where there is unequal knowledge, actual or constructive, and defendant, possessed of such knowledge, knows or should know that harm might or could occur if no warning is given." 103 Ill.Dec. at 143, 501 N.E.2d at 164; *see also Smith v. American Motors Sales Corp.,* 215 Ill.App.3d 951, 159 Ill.Dec. 477, 482, 576 N.E.2d 146, 151 (Ill. App.Ct.1991) (jeep manufacturer had no

would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used....
N.J.S.A. 2A:58C–4.

duty to warn operators and passengers not to extend foot outside passenger compartment while jeep is being operated). The *Miller* court explicitly stated no duty to warn exists for obvious dangers. 103 Ill. Dec. at 143, 501 N.E.2d at 164.

As previously mentioned, the risk of collisions while operating a motorcycle is open and obvious. Concomitant with being in an accident while operating a motorcycle, an open air vehicle, is the inherent danger of receiving injuries to one's legs. As indicated by the *Miller* court, the knowledge of Yamaha that crash bars were available "does not preclude [McWilliams] ... from inquiring as to the availability of possible safety devices with respect to obvious risks."[6] 103 Ill.Dec. at 144, 501 N.E.2d at 165. Accordingly, Yamaha's failure to recommend crash bars or warn McWilliams of the dangers inherent in operating a motorcycle without crash bars cannot be the basis of liability; Yamaha had no duty to warn McWilliams of the obvious risks inherent in riding the Virago.

Because Yamaha did not have a duty to warn of the risk of lower-leg injury, the Plaintiffs are precluded from arguing that the lack of a warning was an inadequate warning under subsections 2 and 4 of the Products Liability Law. Summary Judgment is granted on Counts Two and Five pursuant to Fed.R.Civ.P. 56.

### D. *Negligence and Breach of Implied Merchantability Claims*

In Counts One, Three, Four and Six the Plaintiffs assert claims for negligence and breach of implied warranty of merchantability on the basis that the Virago lacked crash bars. Complaint, 6–7. The Products Liability Law is applicable to "actions for damages for harm caused by products...." N.J.S.A. 2A:58C–1(a); *see also,* 29 October Letter; 30 October Letter. A "product liability action" is defined as "*any* claim or action brought ... for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. 2A:58C–1(b)(3) (em-

phasis added). Both Yamaha and McWilliams interpret this language to allow the claims for negligence and breach of implied warranty of merchantability to be raised subject to the standards set forth in the Products Liability Law. 29 October Letter; 30 October Letter.

In *Tirrell,* the court stated the Products Liability Law "no longer recognizes negligence or breach of warranty (with the exception of an express warranty) as a viable separate claim for 'harm'...." 248 N.J.Super. at 398, 591 A.2d 643. The court further stated these claims are subsumed within the new cause of action created by section of two of the Products Liability Act if the "claimant and harm also fall within the definitional limitations of section 1." *Id.* For the reasons set forth above, the Products Liability Law applies in this action; therefore, Counts One, Three, Four and Six are subsumed by Counts Two and Five, the strict liability causes of action. Counts One, Three, Four and Six are dismissed.

*Conclusion*

For the reasons set forth above, summary judgment is granted, and the case is dismissed in its entirety pursuant to Fed. R.Civ.P. 56.

---

**6.** This is especially true in light of the fact that McWilliams was a very experienced motorcycle operator who knew of and appreciated the obvi-

ous dangers of motorcycle riding and was aware of the existence and purpose of crash bars.